**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 15 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

SHARRON WRIGHT-SIMMONS,

Plaintiff - Appellant,

v.

THE CITY OF OKLAHOMA CITY, a
Municipal Corporation,

Defendant - Appellee.

No. 96-6203

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D. Ct. No. CIV-95-681-A)**

Jeffrey A. Lee (George Freedman, with him on the briefs), Lee & Freedman, P.C.,
Oklahoma, City, Oklahoma, appearing for Plaintiff-Appellant.

Wiley L. Williams, Assistant Municipal Counselor (William O. West, Municipal
Counselor, and Susan K. Noland, Assistant Municipal Counselor, with him on the
brief), Office of Municipal Counselor, Oklahoma City, Oklahoma, appearing for
Defendant-Appellee.

Before **TACHA** and **BALDOCK**, Circuit Judges, and **GREENE**, District Judge.[*]

**TACHA**, Circuit Judge.

---

[*] The Honorable J. Thomas Greene, Senior United States District Judge for the
District of Utah, sitting by designation.

Plaintiff, a black employee in the Metro Transit Department of the City of Oklahoma City, appeals the district court's grant of summary judgment in favor of the City on her claims of racial discrimination and retaliation in violation of Title VII. Plaintiff alleges that one of her supervisors, Terry Armentrout, created a racially hostile work environment and that, after her complaints led to Armentrout's resignation, various coworkers retaliated against her. The district court ruled against plaintiff on her discrimination claim, concluding that plaintiff did not show that Armentrout made more than sporadic racial slurs and failed to establish the existence of a hostile work environment. Moreover, the court determined that even if Armentrout did create a racially hostile work environment, the City was not liable for it. The court also ruled against plaintiff on her retaliation claim, holding that even if individual coworkers retaliated against plaintiff, the City was not liable for their actions.

We take jurisdiction under 28 U.S.C. § 1291. Because this is an appeal from a summary judgment decision, we recite and consider the facts in the light most favorable to the plaintiff. See Hirase-Doi v. U.S. West Communications, Inc., 61 F.3d 777, 781 (10th Cir. 1995). We affirm in part, reverse in part, and remand.

I.

Plaintiff began working in the Metro Transit Department in August 1990, where, as the Clerical Coordinator, she supervised four or five customer service clerks. From August 1990 until March 1993, plaintiff's immediate supervisor was Vicki Harty. In March 1993, Harty was moved aside and plaintiff thereafter reported directly to Terry Armentrout, the Assistant Director of Metro Transit. Armentrout, in turn, reported to Steve Klika, the Director of Metro Transit.

The evidence, viewed in the light most favorable to plaintiff, shows that Armentrout frequently made racial slurs and racially derogatory comments. Armentrout also expressed the opinion that too many blacks worked in the department, and he treated the black employees in the department different from the white employees. In the summer of 1993, plaintiff complained to Klika about Armentrout's racist language and conduct. Klika informed plaintiff he would talk to Armentrout about his language, but told plaintiff she should understand that Armentrout grew up in southern Oklahoma and was not racially sensitive. Klika subsequently told Armentrout to watch his language. Armentrout later took plaintiff to task for complaining about his conduct to Klika, rather than directly to him. On December 12, 1993, Klika resigned as Director of Metro Transit, and Armentrout became the Acting Interim Director. Armentrout immediately informed plaintiff she was being demoted, and either Armentrout or Harty told

plaintiff that she no longer needed to attend supervisory staff meetings. Armentrout also informed plaintiff that she would no longer report to him, but would report to Harty once again.

Plaintiff testified that once Harty became her direct supervisor again, she seemed to constantly watch plaintiff. Several other employees substantiated this allegation, and Hugh Kierig, a supervisor in the Planning Division of Metro Transit, verified that Armentrout had given Harty instructions to watch and monitor plaintiff. Harty stated that Armentrout once talked about putting a monitoring device on plaintiff's telephone. In January 1994, plaintiff contacted Dianna Berry in the Personnel Department to discuss an unrelated matter. During their conversation, plaintiff told Berry that she had been documenting incidents that plaintiff believed to be discriminatory and that she knew people who could verify her allegations. Berry asked plaintiff to give her the names of the people and any documentation she had. On February 7, Harty and Kierig contacted Berry to discuss plaintiff's deteriorating work performance and what corrective actions could be taken. When questioned by Berry, Harty and Kierig attributed plaintiff's deteriorating performance to her relationship with Armentrout and his inappropriate comments to plaintiff. Harty and Kierig told Berry they had never reported Armentrout's conduct because they were afraid to get involved.

Plaintiff eventually gave Berry the requested information on February 14.

- 4 -

On February 23, Berry began an official investigation of plaintiff's allegations. As part of the investigation, Berry or other members of the Personnel Department interviewed thirteen past or present Metro Transit employees. These interviews generally confirmed plaintiff's allegations concerning Armentrout's racist conduct. Thereafter, Berry and Lloyd Rinderer, the Personnel Director, interviewed Armentrout to give him an opportunity to respond to the allegations. On March 2, Berry prepared a two-page report of the investigation, to which she attached all the interview notes. In her report, Berry concluded that "Mr. Armentrout's conduct would be considered inappropriate, regardless of the circumstances," and that "the criteria for determining racial harassment has been met." Appellant's App. at 254. Berry submitted her report to Rinderer, who then submitted it to Don Bown, the City Manager. Bown subsequently met with Armentrout and, based on the information contained in the report, informed Armentrout that he would be fired if he did not resign. On March 25, Armentrout submitted his letter of resignation to Bown.

Plaintiff took a leave of absence from April 11 until the beginning of July. While on leave, she filed a grievance against Harty, which was investigated by Randall Hume, the newly appointed Director of Metro Transit. Hume concluded that the evidence did not support plaintiff's allegations of either discrimination or retaliation by Harty, but he did advise plaintiff that, based on his assessment of

the operating needs of Metro Transit, there would be a change in the organizational structure and plaintiff would have a different supervisor. When plaintiff returned to work in July, Rick Cain, the new Assistant Director of Metro Transit, became plaintiff's immediate supervisor.

Plaintiff contends that after she returned to work, various employees began retaliating against her and the other customer service clerks because of plaintiff's complaints against Armentrout. Plaintiff asserts that the retaliation began when one or more white employees reported plaintiff for illegally parking in a handicapped space in the employee parking lot, for which plaintiff received a ticket. Plaintiff also claims that various white employees made her work more difficult by failing to provide her with information in a timely fashion and by being rude to her. Plaintiff related her complaints to both Cain and Hume. At the same time, various Metro Transit employees, who called themselves "The Group," complained to Hume and others about plaintiff's poor performance, among other things. Plaintiff believes that The Group intended to force her to resign through continual harassment. Hume took several steps to resolve the internal disputes in his office, which he viewed as arising largely from employee confusion over internal policies and procedures. Despite Hume's efforts, the situation had not improved by the time plaintiff filed the present suit.

II.

Before determining whether plaintiff's evidence of a hostile work environment and retaliation are sufficient to survive summary judgment, we must first consider whether the two-page report prepared by Berry, and the interview notes attached thereto, are admissible evidence. The City argues that the interview notes attached to Berry's report are inadmissible hearsay. Plaintiff contends that neither the report nor the notes are hearsay because they are offered against a party and constitute "a statement of which the party has manifested an adoption or belief in its truth." Fed. R. Evid. 801(d)(2)(B).

"It is well settled in this circuit that we can consider only admissible evidence in reviewing an order granting summary judgment." Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995). While the party opposing summary judgment "need not produce evidence in a form that would be admissible at trial, . . . the content or substance of the evidence must be admissible." Thomas v. IBM, 48 F.3d 478, 485 (10th Cir. 1995) (citations and internal quotation marks omitted). Hearsay testimony cannot be considered because a third party's description of a witness' supposed testimony is "not suitable grist for the summary judgment mill." Id. (citations and internal quotation marks omitted).

We review a district court's evidentiary rulings for abuse of discretion. See United States v. Davis, 40 F.3d 1069, 1076 (10th Cir. 1994). In this case, the

district court's opinion does not address the admissibility of the report or the attached interview notes for the purpose of the summary judgment inquiry. As we explain below, that evidence is not hearsay. Thus, even if the district court ruled on the summary judgment motion without considering the report and attached notes, that decision to exclude the evidence would itself constitute an abuse of discretion requiring reversal and consideration of the report and interview notes.

Under Rule 801(d)(2)(B), evidence is not hearsay if it "is offered against a party and is . . . a statement of which the party has manifested an adoption or belief in its truth." The First Circuit recently applied 801(d)(2)(B) to a report similar to the one at issue here. In Pilgrim v. Trustees of Tufts College, 118 F.3d 864 (1st Cir. 1997), the plaintiff, an employee of the college, filed a grievance against his supervisor, alleging discrimination on the basis of race and national origin. A grievance committee investigated the allegations, prepared a report favorable to the plaintiff, and submitted the report to the president of the college. The president implemented each of the report's recommendations, including the removal of the plaintiff's supervisor from all supervisory duties. See id. at 870.

The Pilgrim court explained that when determining whether a party has manifested a belief in the truth of a document, the test is "whether the surrounding circumstances tie the possessor and the document together in some meaningful way." Id. (citations and internal quotation marks omitted). A

document is sufficiently "tied" to the possessor "to the extent the adoptive party accepted and acted upon the evidence." Id. In Pilgrim, the college president demoted the employee who allegedly had harassed the plaintiff. The court found that:

> removing [the employee] from all supervisory duties was a serious enough action that we cannot but think that [the president] would not have carried this out unless he accepted the Report's conclusions as the truth. As such, his acceptance of the contents of the Report and his implementation of its recommendations, without disclaimer, served as an adoption of the Report for the purposes of Rule 801(d)(2)(B).

Id. We adopt the First Circuit's approach to adoptive admissions.

In this case, Donald Bown, the City Manager, would not have sought Terry Armentrout's resignation had he not believed Berry's report. When he asked Armentrout for his resignation, Bown told Armentrout: "'This is what I have got, this is the information that I have, it seems to be substantiated, so either you--you resign this afternoon or you will be terminated tomorrow morning.'" Appellant's App. at 393. When Armentrout asked who was saying the damaging things about him, Bown gave him the names of several people, including Carol Gardener, Paula Gordon, and Vicki Harty. Thus, it seems apparent that Bown relied not only on Berry's two-page report, but on the attached notes of witness interviews. While it is true that Bown need not have believed every statement in the report to reach the conclusion that Armentrout

should resign, that fact goes to the weight of the evidence rather than its admissibility. Because Donald Bown accepted the documents and acted upon them, we hold that neither the two-page report nor the attached notes are hearsay, and are therefore admissible.

We turn, then, to the merits of plaintiff's hostile work environment claim. Hostile environment harassment occurs where a supervisor or co-worker's conduct unreasonably interferes with an individual's work performance or creates an intimidating, hostile, or offensive work environment. See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986). To establish her claim, plaintiff must show both that the conduct to which she was subject was "severe or pervasive enough to create . . . an environment that a reasonable person would find hostile or abusive," and that she "subjectively perceive[d] the environment to be abusive." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

Whether a work environment is hostile must be evaluated based on all the circumstances, which may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23. The record here shows that Armentrout's racist conduct was frequent. Armentrout was first the Assistant

Director and then Acting Director of the entire department. White employees as well as black employees described the Metro Transit as being an environment charged with racial tension. Moreover, at least two members of management in the department thought that Armentrout's improper conduct was having a deleterious effect on plaintiff's work performance. Cf. id. at 25 (Ginsburg, J., concurring) ("[T]he adjudicator's inquiry should center, dominantly, on whether the discriminatory conduct has unreasonably interfered with plaintiff's work performance."). Viewing the evidence in the light most favorable to the plaintiff, we conclude that a reasonable jury could find that Armentrout's conduct created a racially hostile work environment in Metro Transit. The question remains, however, whether the City can be held liable for that environment.

In order to determine whether an employer is liable for a hostile work environment created by a supervisor, we look to general agency principles. See Meritor, 477 U.S. at 72. The Restatement (Second) of Agency § 219 is our guide in this area. See id. Section 219 states that:

> (1) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.
> (2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
>     (a) the master intended the conduct or the consequences, or
>     (b) the master was negligent or reckless, or
>     (c) the conduct violated a non-delegable duty of the

master, or

(d) the servant purported to act or to speak on behalf of
the principal and there was reliance upon apparent
authority, or he was aided in accomplishing the tort by
the existence of the agency relation.

From these provisions, we have identified three bases for holding an employer liable: (1) if the conduct violating Title VII occurred within the transgressor's scope of employment; (2) if the employer knew, or should have known about, the violation and failed to respond in a reasonable manner; or (3) if the transgressor acted with apparent authority or was aided in violating the statute by virtue of their agency relationship with the employer. See Bolden v. PRC, Inc., 43 F.3d 545, 551 n.1 (10th Cir. 1994); Sauers v. Salt Lake County, 1 F.3d 1122, 1125 n.3 (10th Cir. 1993).

In recent cases, the Supreme Court has clarified the meaning of § 219(1) and (2)(d) of the Restatement (Second) of Agency, which relate to our first and third basis of employer liability.[1] Our cases previously found § 219(1), the scope-of-employment provision, largely inapplicable to harassment cases, except in the fanciful case that the employer had made such illegal harassment

---

[1]Although those Supreme Court cases were not decided at the time of the district court's decision in this case, they apply with full force. See Harper v. Virginia Dept. of Taxation, 509 U.S. 86, 97 (1993) ("When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule.").

part of the employee's job description. See Hicks v. Gates Rubber Co., 833 F.2d 1406, 1418 (10th Cir. 1987). The district court apparently relied on this line of cases in finding that "Armentrout could not have been acting within the scope of his employment . . . when he committed the harassment." Wright-Simmons v. City of Oklahoma City, No. CIV-95-681-A, slip op. at 6 (W.D. Okla. filed May 7, 1996).

In its recent decisions, the Supreme Court confirmed that harassment by a supervisor is generally not conduct within the scope of employment. See Burlington Indus. v. Ellerth, 118 S. Ct. 2257, 2267 (1998). It did declare, however, that conduct creating a hostile work environment is within the scope of employment for purposes of Title VII employer liability if it was motivated by an intent to serve the employer. See Faragher v. City of Boca Raton, 118 S. Ct. 2275, 2286 (1998); Burlington Indus., 118 S. Ct. at 2266. "There are instances . . . where a supervisor engages in unlawful discrimination with the purpose, mistaken or otherwise, to serve the employer." Id. at 2266. For instance, a supervisor who discriminates based on race in job assignments "in order to placate the prejudice pervasive in the labor force" would be acting within the scope of employment. See Faragher, 118 S. Ct. at 2288. On remand, the district court must apply the intent-to-serve-the-employer standard.

Although Burlington and Faragher involved sexual harassment, the

- 13 -

principles established in those cases apply with equal force to this case of racial harassment for a number of reasons. First, we take the counsel of <u>Faragher</u> itself, which expressed a preference for harmonizing the standards applied in cases of racial discrimination and sexual discrimination. <u>See</u> <u>Faragher</u>, 118 S. Ct. at 2271 n.1. <u>Faragher</u> and <u>Burlington</u> also do not involve situations unique to sexual harassment cases, <u>e.g.</u>, quid pro quo harassment. Furthermore, our cases have always reflected a belief that the employer-liability standards are equivalent for race- and sex-based discrimination. <u>See</u> <u>Bolden v. PRC, Inc.</u>, 43 F.3d 545, 551 n.1 (10th Cir. 1994) (citing sex-discrimination case for employer liability standards in a race-discrimination case). Finally, <u>Burlington</u> and <u>Faragher</u> interpreted the same statutory language at issue here: Is an institution an "employer" for purposes of Title VII?

The second basis for liability, not addressed in either <u>Burlington</u> or <u>Faragher</u>, is employer negligence. The employer may be held liable if it knew, or should have known, about the hostile work environment and failed to respond in an appropriate manner. The evidence shows that, before she lodged a formal complaint with the Personnel Department, plaintiff complained about Armentrout's conduct to two Metro Transit supervisors (Harty and Kierig) who did nothing. Plaintiff also complained to the head of the department (Klika), who had an informal talk with Armentrout, but did not report the matter to the

- 14 -

Personnel Department. Moreover, even absent plaintiff's complaints to supervisors in the department, the evidence suggests that the hostile work environment may have been so pervasive that the City should have known about it before plaintiff lodged her formal complaint with the Personnel Department in February 1994. Even though the Personnel Department subsequently investigated plaintiff's allegations carefully, and the City Manager fired the harasser based on the Personnel Department's investigation, a reasonable jury could find that the City's response was neither timely nor reasonable because it knew or should have known of the hostile work environment before February 1994. Thus, the evidence, viewed in the light most favorable to the plaintiff, could support a finding that the City is liable on the second basis of employer liability. We reverse this portion of the district court's opinion.

The third avenue of employer liability, based on the Restatement (Second) of Agency § 219(2)(d), was explored fully in <u>Burlington</u> and <u>Faragher</u>. For reasons contained in those opinions, the Court explained that applying § 219(2)(d) to the Title VII context meant that:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of

- 15 -

> evidence. The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

Faragher, 118 S. Ct. at 2292-93 (citations omitted); accord Burlington, 118 S. Ct. at 2270.[2] If tangible employment action is taken against the plaintiff, the affirmative defense is not available. See Burlington, 118 S. Ct. at 2269 ("Whatever the exact contours of the aided in the agency relation standard, its requirements will always be met when a supervisor takes a tangible employment action against a subordinate.").

The district court did not examine the third basis for employer liability. On remand, it must apply the language above in order to determine whether Metro Transit can be held liable under this third basis. The operative questions will be whether Armentrout had sufficient control over the plaintiff to be considered her supervisor, whether Armentrout took tangible employment action against her, and whether the plaintiff could have avoided the harm.

---

[2]The plaintiff, relying on a misinterpretation of our opinion in Sauers v. Salt Lake County, 1 F.3d 1122 (10th Cir. 1993), argues that the City is liable for Armentrout's conduct because he was a supervisor who had significant control over the terms and conditions of the plaintiff's job. The discussion of supervisory capacity in Sauers relates solely to the question of when a plaintiff's timely assertion of claims against her supervisor can operate as a timely assertion of claims against her employer. See id. at 1125. Although the plaintiff's interpretation of Sauers shares some likeness with the recent Court decisions, Sauers itself is inapposite to this case.

We turn, finally, to the plaintiff's claim of retaliation. A central portion of plaintiff's retaliation claim is an extension of other hostile environment claims. Although plaintiff's allegations of a hostile work environment concerned only Armentrout's conduct, plaintiff contends that his departure did not alleviate the hostile environment. She argues that the City did not take sufficient steps to eliminate racial hostility and assimilate her back into the workplace after her leave of absence. Whether the City responded appropriately to the information it had concerning the extent and causes of the hostile work environment is a matter better addressed in connection with plaintiff's hostile work environment claim.

To the extent that plaintiff alleges a true retaliation claim, i.e., that the City retaliated against her for engaging in protected activity, we agree with the district court that, even when viewed in the light most favorable to plaintiff, the evidence does not support a retaliation claim. Therefore, the district court properly granted summary judgment in favor of the City on plaintiff's claim of retaliation.

The judgment of the United States District Court for the Western District of Oklahoma is AFFIRMED in part, REVERSED in part, and the case is REMANDED for further proceedings consistent with this opinion.