**Susan LINTZ and Connie Diecidue, Plaintiffs,**

v.

**AMERICAN GENERAL FINANCE, INC. and MorEquity, Defendants.**

**No. 98–2213–JWL.**

United States District Court, D. Kansas.

May 10, 1999.

Hal D. Meltzer, Turner & Boisseau, Chartered, Overland Park, KS, Gabrielle Rhodes, Brown & Nachman, P.C., Kansas City, MO, for Susan Lintz, plaintiff.

Michael P. Oliver, Norman I. Reichel, Chris R. Pace, Wallace, Saunders, Austin, Brown & Enochs, Chartered, Overland Park, KS, for Connie Diecidue, plaintiff.

Lisa White Hardwick, Carole Kay De-Wald, Shook, Hardy & Bacon L.L.P., Kansas City, MO, for defendants.

### MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

Plaintiffs Susan Lintz and Connie Diecidue filed suit against defendants alleging sexual harassment and constructive discharge in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. and the Kansas Act Against Discrimination, K.S.A. § 44–1001 et seq. This matter is presently before the court on defendants' motion for summary judgment against plaintiff Connie Diecidue (doc. # 134). For the reasons set forth below, defendants' motion is granted in part and denied in part.[1]

### I. Facts[2]

Defendant American General Finance, Inc. (AGF) is a consumer finance company. Defendant MorEquity is the real estate lending division of AGF. Each MorEquity branch office is supervised by a Mortgage Manager, who in turn supervises a Loan Analyst/Underwriter. Most branch offices are staffed by only two people—a Mortgage Manager and a Loan Analyst/Underwriter. Some offices, however, are staffed by a third person, a Loan Processor. In December 1995, Scot Johansen was hired as the Mortgage Manager for MorEquity's Kansas City office. In May 1996, Mr. Johansen hired plaintiff Susan Lintz as the Loan Analyst/Underwriter for the Kansas City office. Susan Munson was hired in December 1996 as a part-time Loan Processor for the office. According to plaintiffs, Mr. Johansen began sexually harassing Ms. Lintz shortly after she began working in the Kansas City office.[3]

Ms. Lintz left her employment with MorEquity in April 1997 as a result of Mr. Johansen's conduct. In May 1997, plaintiff Connie Diecidue was hired to replace Ms. Lintz as the Loan Analyst/Underwriter for MorEquity's Kansas City office. Ms. Diecidue remained employed with MorEquity for only five weeks. During this five-week period, Mr. Johansen was Ms. Diecidue's immediate supervisor. During this same period, Ms. Munson was still employed as a part-time Loan Processor.

Prior to Ms. Diecidue's first day of employment, Mr. Johansen gave her a packet of information that defendants routinely give to new employees. The packet included a brochure on sexual harassment. The brochure, entitled "How to Recognize and Prevent Sexual Harassment in the Workplace," defines sexual harassment, discusses how to recognize sexual harassment, instructs the victim of sexual harassment to report such conduct to his or her supervisor or to call defendants' Fair Employment Phone Line at 1–800–682–2433, and emphasizes that defendants will not tolerate sexual harassment. According to Ms. Diecidue, she browsed through the sexual harassment brochure while reviewing the information in the packet and then

---

1. Plaintiff has filed a motion for leave to file a surreply (doc. # 145) to defendants' reply brief. As defendants point out in their opposition to plaintiff's motion, leave to file a surreply is generally only granted in "rare circumstances" as where the movant "improperly raises new arguments in a reply." See *Humphries v. Williams Natural Gas Co.*, No. 96–4196–SAC, 1998 WL 982903, at *1 (D.Kan. Sept.23, 1998). In their reply to plaintiff's response, defendants do not raise new arguments or theories in support of their motion for summary judgment. For this reason, plaintiff's motion for leave to file a surreply is denied and the court will not rely on plaintiff's proposed surreply in analyzing defendant's motion for summary judgment.

2. In accordance with the applicable summary judgment standard, the facts are uncontroverted or related in the light most favorable to plaintiff.

3. The details of Mr. Johansen's behavior toward Ms. Lintz are not relevant to defendants' motion for summary judgment on Ms. Diecidue's claims and, accordingly, the court will not set forth those details here.

"probably tossed it, threw it away." Ms. Diecidue did not read the back page of the sexual harassment brochure which discusses how to recognize sexual harassment in the workplace and which contains the number of the Fair Employment Phone Line.

According to Ms. Diecidue, Mr. Johansen began harassing her on the first day of her employment. Specifically, Ms. Diecidue testified that Mr. Johansen began making comments about "the milk in [her] breasts and the size of [her] breasts."[4] Ms. Diecidue further testified that Mr. Johansen, on one occasion, placed his open mouth within an inch or two of her left breast and offered to "relieve" her breasts. On more than one occasion, according to Ms. Diecidue, Mr. Johansen stated, "Let's see who nips out first," and then lowered the temperature in the office to cause Ms. Diecidue's and Ms. Munson's nipples to become erect. On another occasion, Mr. Johansen allegedly told Ms. Diecidue that they "could relieve the tension for the weekend" and asked her whether she wanted "a quickie." Ms. Diecidue also testified that Mr. Johansen, on one occasion, told her that he could see down her shirt and "to stop it, because [she] was giving him a boner." Mr. Johansen's behavior, according to Ms. Diecidue, consisted not only of inappropriate remarks, but also of inappropriate touchings. Specifically, Ms. Diecidue testified that Mr. Johansen kissed her neck on two occasions; often rubbed her shoulders; grabbed her buttocks on one occasion; and repeatedly rubbed her legs and thighs. On more than one occasion, according to Ms. Diecidue, Mr. Johansen embraced her in an effort to make her breasts leak.

Toward the end of Ms. Diecidue's five-week employment with MorEquity, Ms. Lintz visited Ms. Munson at the MorEquity office in Kansas City. During Ms. Lintz's visit, Mmes. Lintz, Diecidue and Munson discussed Mr. Johansen's behavior.[5] In her deposition, Ms. Diecidue testified that she remembered telling Ms. Lintz that Mr. Johansen repeatedly rubbed her legs. When Ms. Diecidue told Ms. Lintz that she had stopped shaving her legs (presumably in an effort to make Mr. Johansen's behavior cease), Ms. Lintz told her, "Tried that, didn't work." During this conversation, Ms. Diecidue learned that Ms. Lintz "had complained to Eric Pearson and nothing was ever done on her behalf to help her in that situation." Ms. Diecidue further testified that she "might have asked" Mmes. Lintz and Munson what she should do about Mr. Johansen's conduct, and that "that's possibly when one of the two said, 'I complained and it didn't do me any good.'"

On June 26, 1997, Mr. Johansen allegedly became "belligerent" and "furious" concerning Ms. Diecidue's handling of a loan closing. Ms. Diecidue testified that Mr. Johansen's behavior on that day made her "extremely nervous and scared." After finishing her work on the loan, Ms. Diecidue left the office. As she was walking out, she told Mr. Johansen that she was "sick of this shit" and that "life was too short." Mr. Johansen then stated to her, "I take it you're resigning." Ms. Diecidue replied, "Yes." Ms. Diecidue did not return to MorEquity after that day.

It is undisputed that Ms. Diecidue, although she believed that she had been sexually harassed by Mr. Johansen, did not report Mr. Johansen's conduct to defendants at any time during her employment at MorEquity. In an affidavit filed in support of plaintiff's papers, Ms. Diecidue testified that she did not complain about Mr. Johansen's conduct because, "after learning Susan Lintz complained without result, [she] believed complaint would be futile."[6]

---

4. During the period of her employment with MorEquity, Ms. Diecidue was nursing her son.

5. Ms. Diecidue had not met Ms. Lintz prior to Ms. Lintz's visit to the MorEquity office.

6. Defendants urge the court to disregard this portion of plaintiff's affidavit because, in their view, it is inconsistent with plaintiff's deposition testimony. The court finds no discrepancy between the testimony given by plaintiff during her deposition and that provided by

Approximately two weeks after leaving her employment, Ms. Diecidue received a letter from Lisa Kershaw, one of defendant AGF's human resources representatives. In the letter, Ms. Kershaw asked Ms. Diecidue to complete and return an exit questionnaire so that AGF could explore the reasons why Ms. Diecidue left her employment. Ms. Diecidue complied with Ms. Kershaw's request and completed the questionnaire. In the questionnaire, Ms. Diecidue wrote that she felt she had no choice but to resign in light of Mr. Johansen's sexual harassment of her. She described Mr. Johnasen's conduct in some detail. Upon receipt of Ms. Diecidue's questionnaire on July 29, 1997, defendants began investigating the allegations. Karen Kimple, one of defendant AGF's human resources representatives, telephoned Ms. Diecidue on August 4, 1997. When Ms. Diecidue did not answer, Ms. Kimple left a message on Ms. Diecidue's machine asking her to call about the exit questionnaire. Ms. Diecidue returned the call and instructed Ms. Kimple to direct any further inquires to her attorney. Ms. Kimple conducted an investigation into Ms. Diecidue's sexual harassment allegations by interviewing current and former MorEquity employees who had contact with the Kansas City office. Based upon the seriousness of the allegations, Mr. Johansen was suspended on August 14, 1997. At the conclusion of the investigation, the Chairman of defendants' Termination Review Committee approved the recommendation to terminate Mr. Johansen's employment. Defendants discharged Mr. Johansen for misconduct effective September 2, 1997.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences

therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *see Adler*, 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, depo-

plaintiff in her affidavit. In any event, because the court ultimately rejects plaintiff's futility argument (as set forth in connection

with the court's analysis of plaintiff's constructive discharge claim), defendants' argument appears to be moot.

sition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## III. Discussion

Plaintiff Connie Diecidue asserts claims of sexual harassment and constructive discharge against defendants arising out of her employment with MorEquity. For purposes of their motion, defendants do not dispute that Mr. Johansen's conduct towards plaintiff created a hostile work environment amounting to actionable employment discrimination. Rather, the only issue raised in defendants' motion is whether a reasonable jury could find that defendants are liable to plaintiff for Mr. Johansen's conduct. Along those lines, defendants maintain that summary judgment is appropriate on plaintiff's sexual harassment claim based solely on the affirmative defense set forth by the Supreme Court in *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), and *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). In other words, defendants maintain that summary judgment is warranted against plaintiff because defendants took no tangible employment action against her, defendants exercised reasonable care to prevent and correct promptly any sexual harassment in the workplace, and plaintiff unreasonably failed to take advantage of corrective opportunities provided to her by defendants. As set forth in more detail below, defendants' motion is granted in part and denied in part.

A. *Employer Liability After* Faragher *and* Burlington

The only issue raised in defendants' motion is whether a reasonable jury could find defendants liable to plaintiff for sexual harassment perpetrated by Mr. Johansen.

Until recently, there had been "considerable confusion among the circuit and district courts concerning standards governing employer liability under Title VII for sexual harassment perpetrated by supervisory employees." *Harrison v. Eddy Potash, Inc.,* 158 F.3d 1371, 1374 (10th Cir. 1998). In *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), and *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), the Supreme Court provided much-needed guidance on this issue "by specifically outlining the various avenues for imposing direct and vicarious liability on an employer for a supervisor's sexual harassment, and by establishing a general standard for imposing vicarious liability on an employer when a supervisor is alleged to have misused his or her delegated authority in sexually harassing a subordinate employee." *Harrison,* 158 F.3d at 1374. Because defendants' motion for summary judgment turns entirely on these matters, the court will review the Supreme Court's holdings in some detail.

Building on its decision in *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Court looked to principles of agency law as relevant in determining employer liability under Title VII and, more specifically, to section 219 of the Restatement (Second) of Agency. *See Faragher,* 118 S.Ct. at 2285–86; *Burlington,* 118 S.Ct. at 2265–66. Section 219 states that:

(1) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.

(2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:

(a) the master intended the conduct or the consequences, or

(b) the master was negligent or reckless, or

(c) the conduct violated a non-delegable duty of the master, or

(d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

*See Burlington,* 118 S.Ct. at 2267. As the Supreme Court noted, harassment by a supervisor is generally not conduct within the scope of employment. *See id.* at 2266–67; *accord Harrison v. Eddy Potash, Inc.,* 158 F.3d 1371, 1375 (10th Cir.1998) (an employer will be liable for supervisor's harassment under § 219(1) only in "rare circumstances"). The Court recognized, however, that "conduct creating a hostile work environment is within the scope of employment for purposes of Title VII employer liability if it was motivated by an intent to serve the employer." *See Wright–Simmons v. City of Oklahoma City,* 155 F.3d 1264, 1270 (10th Cir.1998) (citing *Faragher,* 118 S.Ct. at 2286; *Burlington,* 118 S.Ct. at 2266).

The Court then turned to address those agency principles set forth in § 219(2) that impose liability on employers for torts committed by employees outside the scope of employment. The Court eliminated subsections (a) and (c) from its analysis and focused instead on subsections (b), albeit briefly, and (d) as "possible grounds for imposing employer liability on account of a supervisor's acts." *See Burlington,* 118 S.Ct. at 2267. Under subsection (b), "an employer is liable when the tort is attributable to the employer's own negligence." *Id.* As the Court emphasized: "An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it. Negligence sets a minimum standard for employer liability under Title VII...." *See id.*

Because the plaintiff in *Burlington* sought to invoke "the more stringent standard of vicarious liability," however, the Court focused primarily on § 219(2)(d). *See id.* Section 219(2)(d) concerns vicarious liability for intentional torts committed by an employee "when the employee uses apparent authority (the apparent authority standard) or when the employee 'was aided in accomplishing the tort by the existence of the agency relation' (the aided in the agency relation standard)." *Id.* Finding the apparent authority analysis inappropriate in the context of supervisor harassment, the Court identified the "aided in the agency relation" rule—based on a supervisor's misuse of delegated authority—as the appropriate form of analysis. *See id.* at 2267–68.

Ultimately, the Court adopted the following standard in determining whether an employer is vicariously liable for harm caused by misuse of supervisory authority:

An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. R.Civ.P. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Faragher,* 118 S.Ct. at 2292–93; *accord Burlington,* 118 S.Ct. at 2270. The Court emphasized, however, that the affirmative defense is not available "when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Faragher,* 118 S.Ct. at 2293; *Burlington,* 118 S.Ct. at 2270; *accord Rubidoux v. Colorado Mental Health Institute,* 173 F.3d 1291, 1295 (10th Cir.1999); *Harrison v. Eddy Potash, Inc.,* 158 F.3d 1371, 1377 (10th Cir.1998).

### B. Application of *Faragher and* Burlington

In her complaint, plaintiff asserts that defendants are liable to her for Mr. Johan-

sen's harassment under two separate and distinct theories—that defendants knew or should have known about Mr. Johansen's conduct and failed to stop it (negligence) and that Mr. Johansen misused the authority delegated to him by defendants to facilitate his harassment of plaintiff. The court will address both of these theories in turn.

### 1. Negligence

As set forth above, the Supreme Court recognized in *Faragher* and *Burlington* the continuing validity of negligence as a separate basis for employer liability. *See Wilson v. Tulsa Junior College,* 164 F.3d 534, 540–41 n. 4 (10th Cir.1998). While defendants do not dispute this principle, they contend that the affirmative defense set forth in *Faragher* and *Burlington* applies with equal force to plaintiff's negligence theory and that, based on the affirmative defense, summary judgment is appropriate. In the alternative, defendants argue that even if the affirmative defense does not apply to plaintiff's negligence theory, summary judgment is still appropriate because the undisputed facts demonstrate that defendant did not know and could not have known about Mr. Johansen's harassment of plaintiff.

 The court turns first to defendants' argument that the *Faragher/Burlington* affirmative defense is available to defendants in connection with plaintiff's negligence theory. As an initial matter, the Supreme Court specifically adopted the affirmative defense in *Faragher* and *Burlington* "[i]n order to accommodate the agency principles of vicarious liability for harm caused by *misuse of supervisory authority."* See Burlington,* 118 S.Ct. at 2270 (emphasis added); *accord Faragher,* 118 S.Ct. at 2292. This strongly suggests that the affirmative defense is limited to those situations where the plaintiff seeks to hold the employer liable under a misuse-of-authority theory. Moreover, the affirmative defense is expressly limited to cases in which the plaintiff seeks to hold the employer *vicariously* liable. Since the *Faragher* and *Burlington* decisions, the

Tenth Circuit has repeatedly characterized negligence as a theory of direct liability. *See, e.g., Baty v. Willamette Indus., Inc.,* 172 F.3d 1232, 1241 (10th Cir.1999) ("An employer is directly liable for a hostile work environment created by any employee if the employer's negligence causes the actionable work environment."); *Wilson,* 164 F.3d at 540–41 n. 4 ("In contrast to the vicarious liability claims addressed in [*Faragher* and *Burlington* ], the only basis for employer liability that Ms. Wilson raised below was a negligence theory."); *Harrison v. Eddy Potash, Inc.,* 158 F.3d 1371, 1374–75 & n. 1 (10th Cir.1998) (stating that *Faragher* and *Burlington* acknowledged the theory of direct liability based on an employer's failure to respond after it knew or should have known of the supervisor's alleged harassment).

Consistent with that characterization, the Tenth Circuit has never suggested that the affirmative defense would apply to a negligence theory. *See, e.g., Wright–Simmons v. City of Oklahoma City,* 155 F.3d 1264, 1270–71 (10th Cir.1998) (discussing affirmative defense only in connection with liability theory based on § 219(2)(d) and not in connection with negligence theory). In fact, in *Wilson v. Tulsa Junior College,* Chief Judge Seymour described the key difference between a negligence theory and vicarious liability theory:

> Although many of the same facts will be relevant to both negligence and vicarious liability claims, in asserting that the employer was negligent the plaintiff bears the burden of establishing that the employer's conduct was unreasonable, while in a misuse of authority claim the employer bears the burden of establishing as an affirmative defense that it exercised reasonable care to prevent harassment.

164 F.3d at 541 n. 4. This clearly supports the conclusion that the affirmative defense is applicable only in connection with misuse-of-authority claims. More significantly for purposes of defendants' motion, however, is the Circuit's approval in *Wilson* of

the district court's instructions to the jury with respect to plaintiff's negligence claim. *See id.* at 540. According to the Circuit, the district court's instructions "comport with the cases stating the requirements for a hostile environment sexual harassment claim based on negligence." *See id.* The court's instructions did not incorporate the *Faragher/Burlington* affirmative defense. *See id.* at 539. The instructions did, however, permit the jury, in determining whether management level employees knew or should have known of the alleged sexual harassment, to consider whether reasonable complaint mechanisms were in place and whether existing mechanisms were effective. *See id.* Moreover, the instructions properly placed the burden on the plaintiff to prove the elements of her negligence claim. *See id.* & 541 n. 4.

For the forgoing reasons, the court is simply not persuaded that the *Faragher/Burlington* affirmative defense is applicable where, as here, the plaintiff seeks to hold the employer liable under a negligence theory of liability. The court then turns to address the merits of defendants' alternative argument—whether the undisputed facts demonstrate that defendants did not know and could not have known of Mr. Johansen's harassment. *See Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir.1998) (to prevail under negligence theory, plaintiff must demonstrate that "the employer had actual or constructive knowledge of the hostile work environment but did not adequately respond to notice of the harassment").

■ In support of her argument that defendants either knew or should have known about Mr. Johansen's behavior, plaintiff sets forth certain facts about Ms. Lintz's complaints to members of defendants' management. Ms. Lintz testified that she telephoned Bob Kissner, Mr. Johansen's direct supervisor at the time, during the first two months of her employment to discuss Mr. Johansen's conduct. According to Ms. Lintz, she told Mr. Kissner that Mr. Johansen was "verbally abusive" in that he had a "temper," that he had "pinched [her] butt," and that he had made "sexual comments" to her. Ms. Lintz did not elaborate to Mr. Kissner with respect to the nature of the sexual comments. Although Ms. Lintz does not recall how Mr. Kissner responded to her complaint, she testified that she felt better after speaking with him. Mr. Kissner, however, did not advise Ms. Lintz that he was going to take any action with respect to Mr. Johansen's behavior. Mr. Johansen's conduct continued after Ms. Lintz complained to Mr. Kissner.

In September 1996, Eric Pearson replaced Bob Kissner as Area Manager and, at that time, became Mr. Johansen's direct supervisor. In November or December 1996, Ms. Lintz briefly discussed Mr. Johansen's behavior with Mr. Pearson. Ms. Lintz testified that she mentioned to Mr. Pearson "something about [Mr. Johansen's] temper and his touching." According to Ms. Lintz, Mr. Pearson did not take any action in response to Ms. Lintz's statements and did not offer her any advice with respect to Mr. Johansen's behavior. She further testified that she had the same discussion with Mr. Pearson a couple of weeks later and that she again discussed Mr. Johansen's temper and "his touching" with Mr. Pearson. Mr. Pearson again did not respond to Ms. Lintz's concerns and Mr. Johansen's conduct continued.

In January 1997, Ms. Lintz again telephoned Mr. Pearson about Mr. Johansen's conduct. This call, according to Ms. Lintz, was sparked by a particular incident. According to Ms. Lintz, Mr. Johansen had "grabbed [her] butt" while Ms. Lintz was standing by the fax machine. After Ms. Lintz tried to move away from Mr. Johansen, Mr. Johansen allegedly became very upset with Ms. Lintz and "threw all the papers on the fax machine" at her. Immediately following this incident, Ms. Lintz called Mr. Pearson. According to her testimony, Ms. Lintz was crying at the time she made the call and she informed Mr. Pearson that she was very upset. Ms. Lintz testified that she specifically told Mr. Pearson that Mr. Johansen had "grabbed

[her] butt with both hands" while he was standing behind her. Apparently, Mr. Pearson then asked Ms. Lintz if she desired to make a "formal complaint." When Ms. Lintz inquired into the nature of such a complaint, Mr. Pearson informed her that she would have to write out her complaint and that Mr. Johansen would have to sign it. According to Ms. Lintz, she rejected this approach because, as she told Mr. Pearson, she did not want Mr. Johansen to find out that she had complained about him for fear his behavior would get worse. Mr. Pearson did not follow up with Ms. Lintz about this conversation.

In February 1997, Ms. Lintz complained about Mr. Johansen's behavior to David Ogg, who was employed as MorEquity's Chief Underwriter at the company's headquarters in Evansville, Indiana. Ms. Lintz testified that she gave Mr. Ogg details about Mr. Johansen's conduct, including details about Mr. Johansen touching her and making sexual comments to her. According to Ms. Lintz, she called Mr. Ogg because she knew he worked in MorEquity's main office and she assumed that he would know what to do about the situation with Mr. Johansen. She testified that her conversation with Mr. Ogg lasted approximately 45 minutes and that Mr. Ogg asked her for additional details about Mr. Johansen's conduct and asked her whether she had complained to anyone else. She further testified that Mr. Ogg told her that he would pass her complaint on to a woman "who was in charge of those kinds of things." Somehow, Ms. Lintz's complaint (or perhaps a distilled version of her complaint) was passed on to Steve Lowencamp, MorEquity's president. At some point after Ms. Lintz's discussion with Mr. Ogg, Mr. Johansen informed Ms. Lintz that Mr. Lowencamp had telephoned him to discuss Ms. Lintz's complaints and that Mr. Lowencamp had simply warned Mr. Johansen "to watch his language around the office."

This evidence, viewed in the light most favorable to plaintiff, could support a finding that defendants were aware of Mr. Johansen's behavior and that they failed to take timely and sufficient remedial action. Even though defendants may not have known that this particular plaintiff suffered a hostile work environment at the hands of Mr. Johansen, a reasonable jury could conclude, based on Ms. Lintz's testimony, that defendants should have known that Mr. Johansen was harassing plaintiff. *See Davis v. United States Postal Serv.,* 142 F.3d 1334, 1342 (10th Cir.1998) (a rational jury could find that defendant negligently failed to remedy a known hostile work environment where evidence suggested that defendant was aware of previous complaints against alleged harasser); *Hirase–Doi v. U.S. West Communications, Inc.,* 61 F.3d 777, 784 (10th Cir.1995) (plaintiff may rely on defendant's notice of any evidence of sexual harassment by alleged harasser that is "similar in nature and near in time" to sexual harassment of plaintiff in order to raise a genuine issue of material fact as to whether defendant knew or should have known of the alleged harasser's conduct).

In sum, the evidence presented to the court, viewed in the light most favorable to plaintiff, is sufficient for a reasonable jury to conclude that defendants failed to take appropriate action to remedy a hostile work environment of which management-level employees knew, or in the exercise of reasonable care, should have known. *See Adler,* 144 F.3d at 673. Defendants' motion for summary judgment on plaintiff's negligence theory of employer liability is denied.

### 2. Misuse of Supervisory Authority

In addition to her negligence theory, plaintiff asserts that defendants are liable to her based on a misuse-of-authority theory. Under this theory, if Mr. Johansen's alleged harassment of plaintiff culminated in plaintiff's constructive discharge (which, the parties agree, constitutes a tangible employment action), then defendants will be liable for any harassment that occurred even though they may have had reasonable mechanisms in place to prevent and to

cure any discriminatory·practices and even though they ultimately stopped further harassment by terminating Mr. Johansen's employment. *See Wright–Simmons v. City of Oklahoma City,* 155 F.3d 1264, 1271 (10th Cir.1998) (citing *Burlington,* 118 S.Ct. at 2269). If, on the other hand, plaintiff was not constructively discharged,[7] then defendants may assert the affirmative defense that it had reasonable mechanisms in place to prevent and to cure any discriminatory practices and that plaintiff unreasonably failed to take advantage of such opportunities. *See Burlington,* 118 S.Ct. at 2270.

### a. Tangible Employment Action

■ In analyzing plaintiff's misuse-of-authority theory, the court turns first to address whether plaintiff suffered a tangible employment action or, more specifically, whether plaintiff was constructively discharged from her employment. In order to establish a constructive discharge claim, plaintiff "must allege facts sufficient to demonstrate under an objective test that a reasonable person would have viewed her working conditions as intolerable." *Jeffries v. State of Kansas,* 147 F.3d 1220, 1233 (10th Cir.1998) (citing *Derr v. Gulf Oil Corp.,* 796 F.2d 340, 343–44 (10th Cir. 1986)). Moreover, if plaintiff resigned of her "own free will," even as a result of Mr. Johansen's actions, she will not be held to have been constructively discharged. *See id.* (citing *Yearous v. Niobrara County Memorial Hosp.,* 128 F.3d 1351, 1356 (10th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1515, 140 L.Ed.2d 669 (1998)). Essentially, plaintiff must show that she "had no other choice" but to quit. *See id.*

According to defendants, plaintiff's constructive discharge claim fails as a matter of law because she "unreasonably refused to explore any option short of resignation." *See Yearous,* 128 F.3d at 1357; *accord Woodward v. City of Worland,* 977 F.2d 1392, 1401 (10th Cir.1992) (plaintiff was not constructively discharged where she failed to establish that "she took steps

short of resignation that a reasonable person would have taken to make her working condition more tolerable"). In support of their argument, defendants emphasize that plaintiff did not report Mr. Johansen's conduct to defendants during her employment. This fact is undisputed. In fact, plaintiff did not notify defendants about Mr. Johansen's behavior until several weeks after her resignation when she completed defendants' exit questionnaire. In such circumstances, the Tenth Circuit has held that a plaintiff has not been constructively discharged. *See Woodward,* 977 F.2d at 1401–02 (no constructive discharge where plaintiff did not lodge complaint about perpetrator's·conduct until after she resigned and, thus, did not determine whether lodging a formal complaint was a reasonable alternative to resignation).

■ As plaintiff points out, however, the Tenth Circuit in *Woodward* recognized that there "may be situations where lodging a complaint with a supervisor would be perceived by a reasonable person to be a clearly futile act" and, in such situations, the plaintiff's failure to lodge a complaint will not necessarily nullify his or her constructive discharge claim. *See id.* at 1402. Along these lines, plaintiff asserts that she did not complain about Mr. Johansen's conduct prior to her resignation because she knew that Ms. Lintz had complained to Eric Pearson about Mr. Johansen's conduct and that Mr. Pearson did not respond effectively to Ms. Lintz's complaint. Even viewing this evidence in the light most favorable to plaintiff, no reasonable person would believe, based solely on the information received from Ms. Lintz, that lodging a complaint against Mr. Johansen would be a "clearly futile act." Significantly, plaintiff's testimony reveals that her knowledge of Ms. Lintz's complaint was derived from one brief conversation with Ms. Lintz who was, by that time, a former employee of MorEquity. Plaintiff's testimony further reveals that plaintiff had no knowledge of the substance or timing of

---

7. Plaintiff does not contend that she suffered any other tangible employment action.

Ms. Lintz's complaint. The court's research has failed to uncover even one constructive discharge case in which a court has recognized the futility of lodging a complaint based solely on vague information received by the plaintiff from the plaintiff's coworker or a former employee. On the other hand, courts have recognized the futility of lodging a complaint in the context of a constructive discharge claim where the plaintiff's own previous complaints were ignored, *see Armstrong v. Woodlawn Organization*, No. 96 C 1156, 1997 WL 323847, at *4 (N.D.Ill. June 11, 1997), where the defendant had already engaged in retaliatory acts against the plaintiff, *see Carlson v. Midway R–1 Sch. Dist.*, 53 F.3d 878, 880 (8th Cir.1995), or where the plaintiff was essentially advised by management that any complaint would be futile, *see Hart v. University System of New Hampshire*, 938 F.Supp. 104, 110 (D.N.H.1996). None of these circumstances are present here.

In short, on this record, plaintiff has failed to establish a genuine dispute as to whether a reasonable person would have believed that there was no reasonable alternative to resignation. Summary judgment in favor of defendants on plaintiff's constructive discharge claim is, therefore, warranted.

### b. Affirmative Defense

Because the court has concluded, as a matter of law, that defendants took no tangible employment action against plaintiff, defendants are entitled to assert the affirmative defense outlined in *Faragher* and *Burlington* in connection with plaintiff's misuse-of-authority theory. As stated earlier, this defense "comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 118 S.Ct. at 2293; *Burlington*, 118 S.Ct. at 2270. The court concludes that genuine issues of material fact exist with respect to whether defendants exercised reasonable care to prevent and correct promptly any sexual harassment in the workplace.

As set forth in the court's analysis of plaintiff's negligence theory, the record before the court poses serious questions concerning the reasonableness of defendants' response to Ms. Lintz's complaints about Mr. Johansen's conduct. Viewing the evidence in the light most favorable to plaintiff, the record reflects that Ms. Lintz complained on numerous occasions to various individuals of defendants' management team. Defendants' response was, at best, ineffective and, at worst, nonexistent. Moreover, defendants' purported failure to correct Mr. Johansen's conduct in a timely fashion allowed Mr. Johansen to victimize plaintiff after Ms. Lintz left her employment with MorEquity. Finally, although defendants place a great deal of emphasis on the fact that they had implemented a sexual harassment policy prior to plaintiff's employment, the Supreme Court recognized in *Meritor* that the mere existence of a grievance procedure and a policy against discrimination does not insulate an employer from liability. *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Defendants have not shown that they are entitled to summary judgment on their affirmative defense.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' motion for summary judgment against plaintiff Connie Diecidue (doc. # 134) is **granted in part and denied in part.** Plaintiff's motion for leave to file a surreply (doc. # 145) is **denied.**

**IT IS SO ORDERED.**