**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 19 1999**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

JENNIFER C. MILLER,

     Plaintiff-Appellant,

v.

REGENTS OF THE UNIVERSITY OF
COLORADO; JAMES CORBRIDGE,

     Defendants-Appellees.

No. 98-1012
(D. Colo.)
(D.Ct. No. 95-S-2929)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRORBY**, **HOLLOWAY**, and **BRISCOE**, Circuit Judges.
_____

Appellant Jennifer Miller brought this action against her former employer

the Regents of the University of Colorado ("the University") and her former

supervisor James Corbridge alleging sex discrimination in violation of Title VII

of the Civil Rights Act of , 42 U.S.C. §2000e *et seq.* , and 42 U.S.C. § 1983. The

district court granted summary judgment in favor of the University and Mr.

_____

[*]  This order and judgment is not binding precedent except under the doctrines of
law of the case, *res judicata* and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

Corbridge.  Ms. Miller now appeals that ruling and various discovery limitations imposed by the district court.  We have jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## I.  Background

Ms. Miller served as an assistant to Mr. Corbridge, the then Chancellor of the University's Boulder campus.  During her tenure in the Chancellor's office, Ms. Miller alleges Mr. Corbridge subjected her to both *quid pro quo* and hostile work environment sexual discrimination.  The alleged harassment began shortly after she started work in 1988, when Mr. Corbridge "leered" at her as she walked down a public hallway.  Shortly thereafter, Mr. Corbridge asked Ms. Miller out for drinks on at least two occasions and invited her to attend "Friday Afternoon Club" social gatherings at the law school on five to ten occasions.  Ms. Miller declined all invitations.  Mr. Corbridge stopped extending invitations to Ms. Miller by early 1989.  Further, Ms. Miller claims Mr. Corbridge touched her in ways she found inappropriate, including hugging her twice (*id.* at 153-57), standing behind or beside her so closely that their bodies touched on several occasions, and rubbing her back and shoulders a few times.  All the allegedly inappropriate touching ended by fall of 1993.  Ms. Miller also contends Mr. Corbridge harassed her by requiring her to place phone calls and make

appointments with various female acquaintances and, on at least three occasions, asking her to chill wine for after work meetings. Ms. Miller admits Mr. Corbridge never made any overt requests for sexual favors. However, she contends that because she rebuffed his sexual overtures, Mr. Corbridge verbally harassed and humiliated her in front of other employees and reassigned some of her job duties to other employees. At the same time, Ms. Miller claims more "compliant" female employees did not suffer such treatment and, in some cases, Mr. Corbridge allegedly rewarded those women with job benefits. Mr. Corbridge resigned as Chancellor effective August 1, 1994. Shortly thereafter, Ms. Miller took an extended leave of absence and eventually resigned from the University in April 1995.

In addition to the conduct Mr. Corbridge allegedly directed at her, Ms. Miller also points to Mr. Corbridge's treatment of other female employees as proof of sexual harassment. Some of the alleged incidents Ms. Miller claims she witnessed during her employment, and others she discovered only after filing this suit. Ms. Miller claims she personally witnessed the following events during her employment:

(1) Mr. Corbridge frequently called and met with three female University employees, Ms. Marie Caldwell, Ms. Lisa Vann and Ms. Mary Jo White.

Ms. Miller often placed the calls and arranged the meetings with these women and she surmised Mr. Corbridge had sexual relationships with them. However, Ms. Miller admits she had no personal knowledge of any such relationship during her employment, never overheard Mr. Corbridge's phone conversations with the women, and never observed any of their meetings.

(2) Mr. Corbridge frequently called and met with Ms. Pauline Hale, the University's Director of Public Relations. Ms. Miller claims she knew Mr. Corbridge was having a sexual relationship with Ms. Hale because they traveled together and lived together. Mr. Corbridge and Ms. Hale married in 1992. Mr. Corbridge required Ms. Miller to assist in planning their wedding.

(3) Mr. Corbridge touched Ms. Jane Branigan, an employee in the Chancellor's office, on the face and hair on one occasion. Ms. Miller also learned that Mr. Corbridge and Ms. Branigan had drinks after work once.

(4) Mr. Corbridge leered at and touched other women throughout Ms. Miller's tenure in the Chancellor's office. Ms. Miller cannot specify the dates on which these incidents occurred or what women they involved.

(5) Ms. Susan Hobson-Panico, a University employee, told Ms. Miller that Mr. Corbridge kissed her during a break in a Regent's meeting. Ms. Miller

did not personally witness the alleged kiss.

The evidence Ms. Miller learned about through discovery but had no personal knowledge of during her employment includes:

(1) Ms. Caldwell's testimony that she had an ongoing sexual relationship Mr. Corbridge.

(2) Former University President Judith Albino's version of a complaint, related to her secondhand by her executive assistant, that Mr. Corbridge paid unwanted attention to and touched a secretary named "Melissa" who worked in President Albino's office. Ms. Albino also testified to her secondhand knowledge of other rumored complaints against Mr. Corbridge. However, Ms. Albino never revealed the names of those women and Ms. Miller never spoke to the alleged complainants directly.

(3) Ms. Hobson-Panico's testimony that Mr. Corbridge touched her in an inappropriate manner on several occasions including grabbing her scarf, whispering in her ear, kissing her, and putting his arm around her.

(4) Testimony by Ms. Marianne Wesson, a University law professor, that Mr. Corbridge had a reputation for inappropriate sexual conduct toward female employees and on one occasion touched her thigh during a social gathering off campus.

(5) Testimony by Ms. Emily Calhoun and Ms. Kaye Howe, both University

professors, that Mr. Corbridge had a reputation for engaging in inappropriate sexual conduct toward female employees.

Based on this evidence, Ms. Miller's Revised Amended Complaint alleged Title VII *quid pro quo* and hostile work environment claims against the University and a 42 U.S.C. § 1983 deprivation of civil rights claim against Mr. Corbridge individually.

Discovery was highly contentious. Early in the process, the defendants moved for a protective order due to the "sensitive nature" of Ms. Miller's allegations, the potential for harassment and undue embarrassment, and significant media coverage of the case. [1] After a hearing, the magistrate judge granted the motion and issued an order limiting the scope and subject matter of future depositions and restricting distribution of discovery materials. Despite Ms. Miller's numerous objections, the district court upheld the protective order and discovery continued subject to its limitations. Subsequently, Ms. Miller filed a series of motions to compel in an attempt to obtain testimony from the University's former ombudsperson, Ms. Hobson-Panico. The district court denied

---

[1] Early in the discovery process, Ms. Miller took the deposition of former University President Judith Albino. Portions of that deposition were leaked to the press which in turn generated several articles in area newspapers.

Ms. Miller's motions to the extent they required Ms. Hobson-Panico to answer questions precluded under the protective order or to reveal information protected by an "ombudsman privilege." An "ombudsman privilege," the district court held, protects communications made with an expectation of privacy to the University ombudsperson.

Defendants then filed a motion for summary judgment, which the district court granted on several grounds. First, the district court concluded the statute of limitations barred Ms. Miller's Title VII claims. In the alternative, the district court found Ms. Miller failed to establish she was a victim of actionable sexual harassment under Title VII. The court granted summary judgment on Ms. Miller's § 1983 claim because it was time barred, or, in the alternative, because Mr. Corbridge was entitled to qualified immunity. On appeal, Ms. Miller argues the district erred by: (1) concluding she failed to establish a prima facie case under Title VII and § 1983; (2) concluding her claims were barred by the statute of limitations; (3) concluding Mr. Corbridge was entitled to qualified immunity; (4) upholding a protective order which improperly limited her discovery rights; (5) limiting discovery pursuant to an ombudsman privilege; and (6) limiting her ability to conduct investigation of the case. We address each of these issues in turn.

## II. Summary Judgment

### A. Title VII Claims

The district court asserted two bases for granting summary judgment on the Title VII claims. First, the court determined Ms. Miller's claims were barred by the statute of limitations, and second, even if they were not, the evidence failed to establish either hostile work environment or *quid pro quo* sexual harassment. On appeal, Ms. Miller argues her claims are not barred by the statute of limitations under the continuing violation doctrine and, further, that she offered sufficient evidence to create a genuine fact dispute on both harassment claims.

We review the district court's grant of summary judgment de novo, applying the same legal standard as the district court. *Penry v. Federal Home Loan Bank*, 155 F.3d 1257, 1261 (10th Cir. 1998), *cert. denied*, 119 S. Ct. 1334 (1999). We "examine the record to determine if any genuine issue of material fact was in dispute; if not, we determine if the substantive law was correctly applied." *Applied Genetics Int'l v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). In applying this standard, we view the factual record and inferences therefrom in the light most favorable to the nonmoving party. *Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1476 (10th Cir. 1996). However, to survive summary judgment, the nonmoving party may not rest upon

the allegations or denials of his or her pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Panis v. Mission Hills Bank*, 60 F.3d 1486, 1490 (10th Cir. 1995), *cert. denied*, 516 U.S. 1160 (1996). Summary judgment is appropriate if a reasonable trier of fact could not return a verdict for the nonmoving party. *Penry*, 155 F.3d at 1261.

In Colorado, a Title VII claimant must file a charge of discrimination with the Equal Employment Opportunity Commission within 300 days after the alleged unlawful discriminatory practice occurred.[2] 42 U.S.C. § 2000e-5(e)(1). This filing is a prerequisite to a civil suit under Title VII; *Martin v. Nannie & the Newborns*, 3 F.3d 1410, 1414 (10th Cir. 1993), and claims based on incidents occurring outside the 300-day limitations period are generally time-barred. *Mascheroni v. Board of Regents*, 28 F.3d 1554, 1561-62 (10th Cir. 1994). However, under the continuing violation doctrine, a plaintiff may recover for incidents which occurred outside the statutory time limit if at least one instance of the alleged discriminatory practice occurred within the limitations period and the earlier acts are part of a "continuing pattern of discrimination." *Martin*, 3 F.3d at

---

[2] The 300-day filing period applies to "deferral states" in which the Equal Employment Opportunity Commission defers to the enforcement efforts of a state agency empowered to undertake employment discrimination investigations. 42 U.S.C. § 2000e-5(e)(1). Otherwise, the filing period is 180 days. *Id.*

1415 (quotation marks and citation omitted). To determine whether alleged incidents of discrimination constitute a continuing violation we consider three factors:

> (i) subject matter – whether the violations constitute the same type of discrimination; (ii) frequency; and (iii) permanence – whether the nature of the violations should trigger an employee's awareness of the need to assert her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate.

*Martin*, 3 F.3d at 1415. A plaintiff may not invoke the continuing violation doctrine by merely alleging that acts occurring outside the statutory time period had a continuing effect within the statutory period. *Id.* At the same time, the discriminatory act occurring within the time period "need not constitute a legally sufficient Title VII claim in itself." *Mascheroni*, 28 F.3d at 1561.

In this case, Ms. Miller filed a Charge of Discrimination with the Equal Employment Opportunity Commission on April 5, 1995. Subtracting 300 days from that date results in a limitations period starting June 10, 1994. Because the vast majority of Ms. Miller's allegations occurred outside of that limitations period, *i.e.*, before June 10, 1994, Ms. Miller attempts to invoke the continuing violation doctrine. To accomplish this, she must demonstrate that Mr. Corbridge engaged in a series of related discriminatory acts, at least one of which occurred *on or after* June 10, 1994. After a thorough review of the record, the district

-10-

court determined Ms. Miller failed to identify a single discriminatory act occurring after June 10, 1994. The court therefore denied application of the continuing violation doctrine and concluded that Ms. Miller's Title VII claims were time barred. We agree.

As the district court noted, Ms. Miller's claims rest solely upon the alleged conduct of Mr. Corbridge. However, none of her allegations specify discriminatory conduct by Mr. Corbridge on or after June 10, 1994. In fact, the record indicates Mr. Corbridge resigned from the Chancellor's office effective August 1, 1994 and that he was out of the office on vacation for part of June and all of July 1994. *See Purrington v. University of Utah*, 996 F.2d 1025, 1029 (10th Cir. 1993) ("[W]hen the person harassing a plaintiff leaves [his] job, the harassment ends." (Internal quotation marks and citation omitted.)). Ms. Miller argues she "established violations which occurred as late as July or August, 1994." To support this assertion, Ms. Miller contends Mr. Corbridge "continued to be responsible" for her work environment until August 1, 1994. However, the continuing effect of conduct occurring outside the limitations period is insufficient to invoke the continuing violation doctrine. *Martin*, 3 F.3d at 1415.

Ms. Miller also claims that during the summer of 1994, Mr. Corbridge

"utilized his power and influence to reward the compliant women ... and punish Miller" by not recommending her for a position with the incoming Chancellor and by reassigning some work duties to other employees. Neither of these allegations is sufficient to invoke the continuing violation doctrine. First, while it does appear Mr. Corbridge made personnel recommendations to the incoming Chancellor, we are not persuaded that Mr. Corbridge's recommendation (or lack thereof) amounts to a discriminatory act. The Equal Employment Opportunity Commission defines sexual harassment to include situations in which the plaintiff's submission to or rejection of sexual conduct is made a *term or condition of employment* or is used as the basis for an employment decision *affecting the individual* as well as conduct of a sexual nature that unreasonably interferes with the plaintiff's work environment. 29 C.F.R. § 1604.11(a) (emphasis added). In this case, Mr. Corbridge's recommendation did not have an impact on Ms. Miller's work environment or any direct affect on Ms. Miller's employment status. In fact, the new Chancellor, Mr. Roderic Park, retained Ms. Miller despite Mr. Corbridge's allegedly unfavorable recommendation. In any event, it was *Mr. Park* who made the decisions affecting Ms. Miller's employment during his administration and Mr. Park's conduct is not at issue in this case. [3]

---

[3] Ms. Miller originally included Mr. Park as a defendant in this suit but later voluntarily dismissed him. Ms. Miller admits Mr. Park never sexually harassed her.

While we recognize Ms. Miller need not demonstrate the commission of an act constituting a legally sufficient Title VII claim to invoke the continuing violation doctrine, she must at least identify a discriminatory act by Mr. Corbridge that impacted her employment in some manner. [4] *See Mascheroni*, 28 F.3d at 1562.

Second, we find no factual support for Ms. Miller's allegations regarding Mr. Corbridge's job duty re-assignment in the summer of 1994. Ms. Miller testified Mr. Corbridge reassigned some of her job duties to Ms. White when Ms. White returned to the Chancellor's office after attending law school. Ms. White

---

[4] Even if Mr. Corbridge's personnel recommendation and reassignment of duties constituted discriminatory acts within the limitations period, those acts are not sufficient to invoke the continuing violation doctrine. *See Martin*, 3 F.3d at 1415 (listing factors to be considered in assessing continuing violations). The alleged incidents of harassment were relatively infrequent over the six years of Ms. Miller's employment. More important, the nature of the alleged violations should have triggered Ms. Miller's awareness of the need to assert her rights. Ms. Miller testified that she believed the harassment began shortly after she started work in the Chancellor's office and that the early incidents influenced her perceptions of Mr. Corbridge and led her to believe that his later conduct was also motivated by discriminatory bias. In addition, the vast majority of her allegations center on events occurring between 1988 and 1993. Yet Ms. Miller waited until 1995 to file a complaint. Because Ms. Miller knew of the alleged discrimination as early as 1988, she had a duty to assert her rights at that time, and she may not now rely on the continuing violation doctrine to overcome the statutory filing requirements. *Martin*, 3 F.3d at 1415 n.6 ("[I]f an event or series of events should have alerted a reasonable person to act to assert his or her rights at the time of the violation, the victim cannot later rely on the continuing violation doctrine to overcome the statutory requirement of filing a charge with the [Equal Employment Opportunity Commission] with respect to that event or series of events.").

returned to the Chancellor's office on a full time basis in 1993 – well before June 10, 1994. Ms. Miller also claims her job duties changed during the transition period between Mr. Corbridge and Mr. Park. However, the record shows Mr. Park was responsible for the personnel decisions affecting his term of office, and we find no evidence that Mr. Corbridge reassigned any duties in the summer of 1994.

In sum, we conclude Ms. Miller has failed to allege at least one discriminatory act occurring within the 300-day limitation period and, as such, she cannot invoke the continuing violation doctrine to preserve her claims. Thus, the district court appropriately determined that Ms. Miller's Title VII claims are time-barred. [5] *See Mascheroni*, 28 F.3d at 1562 (concluding the statute of limitations barred plaintiff's Title VII claims because he failed to allege at least one discriminatory act occurring within the limitation period).

Ms. Miller also contends the district court erred in granting the University's motion for summary judgment based on her failure to present sufficient evidence of a hostile work environment or *quid pro quo* sexual harassment. Ms. Miller

_____

[5] We agree with the district court's conclusion that Ms. Miller has not presented circumstances under which she is entitled to equitable tolling of the limitations period.

argues she presented enough evidence to create a genuine issue of material fact on both claims. We disagree. [6]

To survive summary judgment on her *quid pro quo* claim, Ms. Miller must show that a reasonable jury could find Mr. Corbridge conditioned concrete employment benefits on her submission to sexual conduct. *Martin*, 3 F.3d at 1416. "The gravamen of a quid pro quo sexual harassment claim is that tangible job benefits are conditioned on an employee's submission to conduct of a sexual nature and that adverse job consequences result from the employee's refusal to submit to the conduct." *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1414 (10th Cir. 1987). Ms. Miller admits Mr. Corbridge never made overt requests for sexual favors. Instead, Ms. Miller contends Mr. Corbridge "punished" her for rebuffing his sexual advances by taking tangible job benefits from her while at the same time rewarding more "compliant" women with job benefits. The tangible job benefits Mr. Corbridge allegedly took from Ms. Miller include: (1) job duties, (2) an employment recommendation to the new Chancellor, and (3) ultimately her job because Mr. Corbridge's conduct caused a mental break down

---

[6] Although the statute of limitations bar is a sufficient basis upon which to affirm the district court's ruling, we nevertheless address the court's alternative analysis because it is crucial to other issues in this case.

which in turn forced her to quit. [7] None of these allegations is sufficient to create a genuine issue of material fact regarding specific adverse job consequences Ms. Miller suffered.

First, although the record is somewhat unclear, it appears Ms. Miller's job duties were altered on two occasions. In 1993, Ms. Miller claims Mr. Corbridge assigned some of her duties to Ms. White when Ms. White returned to the Chancellor's office after attending law school. However, as Ms. Miller admits, Ms. White performed those duties before she went to law school, and Mr. Corbridge merely restored them to Ms. White when she returned. Ms. Miller cannot lose tangible job benefits that were never hers to begin with. [8]

Ms. Miller makes much of the fact that Mr. Corbridge and Ms. White were allegedly having an affair at the time. However, their consensual romantic

---

[7] In her brief, Ms. Miller implies that Mr. Corbridge yelled at and humiliated her because she refused his sexual overtures. We agree with the district court that such conduct does not amount to the denial of a "concrete employment benefit" and cannot form the basis of a *quid pro quo* claim. *Martin*, 3 F.3d at 1416.

[8] Ms. Miller admits her allegations regarding the loss of tangible job benefits prior to August 1994 are "very weak" since prior to that date "what Jennifer Miller had lost in terms of a concrete benefit was admittedly marginal."

involvement, if any, is of no consequence. [9] Title VII does not prohibit favoritism shown to a supervisor's paramour because such preferential treatment is based on voluntary romantic affiliation and not gender differences. *See Taken v. Oklahoma Corp. Comm'n*, 125 F.3d 1366, 1370 (10th Cir. 1997) (concluding plaintiff's allegations that defendant supervisor preselected his paramour for a promotion did not state an actionable Title VII claim because allegations were based on voluntary romantic affiliation and not gender differences). Thus, even assuming Mr. Corbridge and Ms. White were romantically involved and that Mr. Corbridge favored Ms. White in some manner, such favoritism would not present an actionable *quid pro quo* claim.

The second reassignment of duties allegedly occurred during the transition from Chancellor Corbridge to interim Chancellor Roderic Park. However, the record shows Mr. Corbridge merely made recommendations to the incoming Chancellor and that Mr. Park was responsible for the personnel decisions affecting his term of office. Ms. Miller admits Mr. Park did not discriminate against her and, therefore, she cannot base her *quid pro quo* claim on his decisions.

_____

[9] Both Ms. White and Mr. Corbridge deny any such involvement.

We also conclude Mr. Corbridge's employment recommendation to Mr. Park and Ms. Miller's resignation from the University are not denials of "concrete employment benefits." Mr. Corbridge's recommendation to Mr. Park was just that – a recommendation. Mr. Park was free to act on that recommendation or not. Regardless, the recommendation itself had no direct, tangible impact on Ms. Miller's job. *Cf. Sanders v. Casa View Baptist Church*, 134 F.3d 331, 338 (5th Cir.) (affirming summary judgment against plaintiffs on their *quid pro quo* claim where evidence revealed that defendant's alleged conduct had no tangible affect on plaintiffs' jobs), *cert. denied*, 119 S. Ct. 161 (1998). Rather, it is Mr. Park's actions that impacted Ms. Miller's job duties and, as we stated above, Mr. Park's actions cannot serve as a basis for Ms. Miller's *quid pro quo* claim. Likewise, Ms. Miller cannot transform her decision to resign into the loss of a concrete employment benefit by alleging Mr. Corbridge caused her to quit. Mr. Corbridge no longer worked in the Chancellor's office when Ms Miller resigned and it was therefore impossible for him to condition her continued employment on submission to sexual conduct. Thus, Ms. Miller has failed to present sufficient evidence that she suffered a tangible, adverse job consequence as a result of her failure to submit to unwelcome sexual advances. For these reasons, the district court did not err in granting summary judgment on her *quid pro quo* claim.

We next consider Ms. Miller's hostile work environment claim. A hostile work environment occurs when unwelcome sexual conduct unreasonably interferes with an employee's performance or creates an intimidating, hostile, or offensive work environment. *Smith v. Northwest Fin. Acceptance, Inc*., 129 F.3d 1408, 1412 (10th Cir. 1997) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)). To survive summary judgment, Ms. Miller must show that a rational jury could find the harassment so severe or pervasive as to alter the conditions of the her employment and create an abusive working environment. *Smith*, 129 F.3d at 1412. The conduct must be both objectively and subjectively abusive. *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1071 (10th Cir. 1998). Ms. Miller must also produce evidence that "the conduct at issue was not merely tinged with offensive sexual connotations but actually constituted discrimination because of sex." *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, __, 118 S. Ct. 998, 1002 (1998) (internal quotation marks omitted). To determine whether an environment is hostile or abusive, we examine the totality of the circumstances including factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 23 (1993). Conduct which merely engenders offensive feelings or amounts to normal job stress does

not violate Title VII. *See Smith* , 129 F.3d at 1412; *Trujillo v. University of Colo. Health Sciences Ctr.* , 157 F.3d 1211, 1214 (10th Cir. 1998).

Ms. Miller fails to make the required showing. As the district court noted, many of Ms. Miller's allegations center on incidents she was not aware of during her employment. However, to establish a genuine issue of material fact as to whether she was subject to a hostile work environment, Ms. Miller may rely only on conduct she was aware of during her employment. [10] *Hirase-Doi v. U.S. West Communications, Inc.* , 61 F.3d 777, 782 (10th Cir. 1995). Considering only that evidence, we are unable to conclude that a rational jury could find the alleged harassment severe or pervasive enough to constitute an objectively hostile work environment. As Ms. Miller admits, her allegations contain none of the "hallmarks" of a sexually hostile work environment claim such as overt requests for sexual favors, lewd remarks or sexual comments about her body or clothing, jokes of a sexual nature, or display of sexually oriented materials. *Trujillo* , 157

---

[10] Because the severity-pervasiveness standard is an inquiry aimed at establishing whether *the plaintiff* experienced an abusive environment, we consider only that conduct *the plaintiff* was aware of during the time at issue. *See Hirase-Doi v. U.S. West Communications, Inc.*, 61 F.3d 777, 782 (10th Cir. 1995). This is true whether we are evaluating the evidence from the plaintiff's subjective viewpoint or a reasonable person's objective viewpoint. Either way the focus remains on the conduct experienced by the plaintiff. *See, e.g., Smith*, 129 F.3d at 1413-14 (examining plaintiff's work environment from a subjective and objective point of view).

F.3d at 1214 (concluding plaintiff failed to establish a racially hostile work environment where there was no evidence of physically threatening or humiliating activity, racial slurs, or ridicule). The unwelcome touching and leering directed at Ms. Miller was relatively infrequent and completely ceased by the fall of 1993. *See Penry*, 155 F.3d at 1263 (concluding gender-based incidents occurring sporadically over a three year period were insufficient to establish a hostile work environment). Moreover, the touching was relatively mild in character – it did not involve intimate body parts, nor was it physically threatening. *See, e.g., Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998) (concluding incidents during which a co-worker allegedly touched plaintiff's arm, fingers, and buttocks were too mild and infrequent to establish a hostile work environment). In fact, many of Ms. Miller's co-workers testified that while Mr. Corbridge had a "friendly" style and frequently touched male and female employees during conversations, his touching was neither sexual nor offensive. Mr. Corbridge's alleged touching of other women, including Ms. Branigan and Ms. Hobson-Panico, is likewise too infrequent and mild in character to establish a hostile work environment.

Ms. Miller's other allegations also lack the severity or pervasiveness necessary to establish a work environment "permeated with discriminatory

intimidation, ridicule and insult." *Smith*, 129 F.3d at 1414 (internal quotation marks and citation omitted). Mr. Corbridge's invitations to attend University social gatherings and after work drinks were infrequent and confined to the first few months of Ms. Miller's six-year tenure in the Chancellor's office. The fact that Mr. Corbridge directed Ms. Miller to arrange phone calls and meetings is also not indicative of a hostile work environment. It was Ms. Miller's job to place phone calls and arrange meetings for the Chancellor, and we fail to see how directing an employee to perform regular job duties amounts to harassment. Ms. Miller claims she was forced to "enable [Mr. Corbridge] in his romantic endeavors," and testified "[i]t was offensive that I would have to arrange his social life .... That wasn't in my job description. That wasn't something I felt that I should have to do." Yet, Ms. Miller admits she never witnessed any of the calls or meetings, and we find no evidence that she was in any way subject to their content, romantic or otherwise. Her unsupported speculation about what did occur does not transform the Chancellor's request that she perform her regular job duties into evidence of a hostile or abusive work environment.

Viewing the totality of the circumstances, including the general work atmosphere and the specific conduct directed at Ms. Miller and others, we find insufficient evidence of either severe or pervasive harassment. As the district

court noted, Ms. Miller's evidence shows nothing more than her subjective opinion that Mr. Corbridge's behavior was inappropriate for a boss. Such opinions are not actionable under Title VII. The district court correctly granted summary judgment on the hostile work environment claim.

B. § 1983 Claim.

In granting Mr. Corbridge's motion for summary judgment on Ms. Miller's § 1983 claim, the district court again asserted two bases for its decision. The court concluded Mr. Corbridge was entitled to qualified immunity or, in the alternative, that the claim was barred by the relevant statute of limitations. After reviewing the district court's grant of summary judgment de novo and applying the same legal standard as the district court, *Penry*, 155 F.3d at 1261, we conclude the district court properly determined that Mr. Corbridge is entitled to qualified immunity.

Qualified immunity shields government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutionality rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Before reaching the qualified immunity issue, however, we must first

determine whether Ms. Miller's allegations, if accepted as true, state a claim for violation of any rights secured under the Constitution. *Abeyta v. Chama Valley Indep. Schl. Dist.*, 77 F.3d 1253, 1255 (10th Cir. 1996). We will not reach the qualified immunity issue if Ms. Miller's claims are not actionable. *Abeyta*, 77 F.3d at 1255. Ms. Miller has the burden to "show with particularity facts and law establishing the inference that defendant violated a constitutional right." *Id.* (quotation marks and citation omitted). "More is required to state a claim for a constitutional violation ... than for a statutory claim under Title VII." *Id.* at 1256.

Ms. Miller claims Mr. Corbridge violated the Equal Protection Clause by committing both *quid pro quo* and hostile work environment sexual harassment. However, as discussed above, Ms. Miller's evidence does not sufficiently demonstrate that Mr. Corbridge committed actionable harassment under Title VII. Because she cannot demonstrate that Mr. Corbridge's conduct violated Title VII, her constitutional claim based on the same conduct fails as well. *See id*. Thus, the district court did not err in granting summary judgment on Ms. Miller's §1983 claims.

## III. Discovery Limitations

In relevant part, the protective order limited discovery by: (1) prohibiting

deposition questions based on rumor and innuendo; (2) requiring deponents to identify where or from whom they obtained the information testified to, when they obtained the information, and the nature of the information; (3) limiting discovery concerning Mr. Corbridge's alleged improprieties to employees of the Chancellor's office and employees over whom Mr. Corbridge had direct supervision; and (4) limiting discovery to the time frame of Ms. Miller's employment in the Chancellor's office. The district court also made discovery rulings that prohibited Ms. Miller from questioning witnesses about Mr. Corbridge's inappropriate conduct if the conduct occurred outside the office, and if Ms. Miller was unaware of it during her employment. The court offered two primary bases for imposing these discovery limitations: (1) the excluded information was not relevant to Ms. Miller's claims, and (2) the limitations served to protect both parties and non-parties from annoyance, embarrassment, intimidation and oppression. Ms. Miller argues the court improperly limited her ability to discover relevant information about Mr. Corbridge's alleged improper sexual conduct. She contends such information is relevant to establish the "nuances" of her hostile work environment, to prove motive and discriminatory intent, as well as the University's vicarious liability for Mr. Corbridge's actions. In addition, Ms. Miller claims the district court mischaracterized relevant evidence about Mr. Corbridge's conduct as rumor and innuendo.

-25-

We review the district court's discovery order for abuse of discretion. *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1520 (10th Cir. 1995). We will not disturb the trial court's ruling "absent a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Kidd v. Taos Ski Valley, Inc.*, 88 F.3d 848, 853 (10th Cir. 1996) (internal quotation marks and citation omitted). A court abuses its discretion if its ruling is arbitrary, capricious, whimsical, or manifestly unreasonable. *Coletti v. Cudd Pressure Control*, 165 F.3d 767, 777 (10th Cir. 1999). An erroneous discovery ruling will not lead to reversal unless the error affected the substantial rights of the parties. *Frontier Ref., Inc. v. Gorman-Rupp Co., Inc.*, 136 F.3d 695, 705 (10th Cir. 1998).

We agree with the district court that it has wide discretion to limit the scope of discovery based on the rights and needs of the parties. *See Gomez,* 50 F.3d at 1520. Specifically, the federal rules give district courts the power to limit discovery if "the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26 (b)(2)(iii). District courts may also issue a protective order if "justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c). The district court is in the best position to weigh these variables and determine

the appropriate limits because, unlike an appellate court, the district court has the ability to view firsthand the progression of the case, the litigants, and the impact of discovery on parties and nonparties. *Cf. Moothart v. Bell*, 21 F.3d 1499, 1504 (10th Cir. 1994) (concluding that the abuse of discretion standard is appropriate in reviewing a trial court's evidentiary rulings because the trial court has the firsthand ability to view the witness or evidence and assess credibility and probative value).

In this case, the district court weighed the significant burdens Ms. Miller's proposed discovery would place on both parties and non-parties against the potential relevance of the information sought, concluded the burdens outweighed the benefits, and imposed limitations accordingly. We agree that much of the information excluded, including reports of conduct based on rumors and innuendo, and other women's experiences that were remote in time and attenuated from Ms. Miller's experiences, has limited relevance to Ms. Miller's claims. *See Hirase-Doi*, 61 F.3d at 782 (concluding plaintiff may only rely on evidence of conduct she was aware of to prove the existence of a hostile work environment). We also agree that inquiries into such conduct could and did unduly harass, intimidate and disparage parties and non-parties to this case. Furthermore, we note the district court allowed Ms. Miller significant discovery regarding people

-27-

and events that did directly affect her employment and work environment. [11] *See*

*Gomez*, 50 F.3d at 1520 (concluding the district court did not abuse its discretion in limiting discovery in Title VII case were plaintiff was provided abundant discovery).

However, we must address some concerns we have with the district court's analysis regarding relevancy. Under the federal rules, a party may obtain discovery of "any matter, not privileged, which is relevant to the subject matter

---

[11] We find no merit in Ms. Miller's argument that the district court erroneously prohibited her from interviewing witnesses on Ms. Albino's "list." The list contains names of women that Ms. Albino claims might have suffered sexual harassment on the Boulder campus. The only names the district court refused to reveal where those of women whose alleged complaints Ms. Albino heard of through the campus "rumor mill." We find no abuse of discretion in that decision. The remaining names Ms. Miller already knew, Ms. Albino could not identify, or the court allowed to be revealed. Ms. Miller was free to interview those remaining women. The district court merely cautioned her to make sure the testimony would be useful before interviewing them.

Ms. Miller also claims the court erroneously prevented her from having ex parte communications with former Chancellors of the University. However, Ms. Miller failed to cite to or include a transcript of the district court's oral ruling. We therefore decline to review the issue. *See McGinnis v. Gustafson*, 978 F.2d 1199, 1201 (10th Cir. 1992) (refusing to review issue because appellant's failure to include transcript of the district court's oral ruling "raises an effective barrier to informed, substantive appellate review."); *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1540 n.3 (10th Cir.), *cert. denied*, 519 U.S. 928 (1996) ("We may refuse to review alleged error if the party seeking review fails to include and reference the portion of the record wherein their objection and the district court's ruling thereon may be found." (Internal quotation marks and citation omitted.)).

-28-

involved in the pending action." Fed. R. Civ. P. 26(b)(1). Of course, information need not be admissible to be considered relevant for discovery purposes. Rather the information sought must "appear[] reasonably calculated to lead to the discovery of admissible evidence." *Id.* In its analysis, the court seems to imply that all evidence regarding Mr. Corbridge's conduct toward other women which Ms. Miller was unaware of during her employment was irrelevant to Ms. Miller's Title VII claims. While we agree the evidence has limited value to Ms. Miller in this case, such evidence is not totally irrelevant to a harassment claim under Title VII.

For example, in a hostile work environment claim, a plaintiff must show (1) that the harassment was severe or pervasive enough to alter the terms, conditions or privilege of employment and (2) that the harassment stemmed from discriminatory animus. *Trujillo*, 157 F.3d at 1214. We have previously held that a plaintiff may not rely on evidence of conduct he or she was unaware of to establish element number one – the severity and pervasiveness of the harassment. *See Hirase-Doi*, 61 F.3d at 782; *Creamer v. Laidlaw Transit, Inc.*, 86 F.3d 167, 171 (10th Cir.), *cert. denied*, 519 U.S. 983 (1996). However that evidence may be relevant to establishing element number two – discriminatory intent. *See Spulak v. K Mart Corp.*, 894 F.2d 1150, 1156 (10th Cir. 1990) (holding that

testimony of other employees about their treatment by the defendant is relevant to the issue of discriminatory intent). The relevance of such testimony is not affected by the plaintiff's knowledge of conduct because it is offered to show the defendant's state of mind rather than the plaintiff's experiences in the workplace. *See Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 110-11 (3d Cir. 1999) (concluding evidence of defendant supervisor's harassment of other women was relevant to show motive in plaintiff's hostile work environment claim even though plaintiff had no personal knowledge of the events). Of course, the court may exclude such testimony if the witness' statements have no logical or reasonable connection to the plaintiff's circumstances. *See Curtis v. Oklahoma City Pub. Schl. Bd. of Educ.*, 147 F.3d 1200, 1217 (10th Cir. 1998).

Conduct the plaintiff was unaware of might also be relevant to prove an employer's liability for sexual harassment by one of its employees. There are three bases for holding an employer liable under Title VII: (1) if the employee's conduct occurred within the scope of his employment, (2) if the employer knew or should have known about the employee's conduct and failed to respond in a reasonable manner, and (3) if the employee acted with apparent authority. *See Wright-Simmons v. City of Okla. City*, 155 F.3d 1264, 1269-70 (10th Cir. 1998). Evidence of a supervisor's harassment of other women may be relevant to

establish employer liability under the second basis, even if the plaintiff was unaware of it, so long as the harassment was similar in nature and close in time to plaintiff's experiences. *Hirase-Doi,* 61 F.3d at 783-84; *see also Hurley*, 174 F.3d at 111 (concluding evidence of other acts of harassment and widespread sexism is probative of whether defendant employer knew or should have known that sexual harassment was occurring, regardless of whether plaintiff employee had knowledge of the incidents). In addition, a supervisor's conduct may be relevant under the third basis, to rebut the employer's affirmative defense that it exercised reasonable care to prevent and correct the supervisor's behavior. *See Faragher v. City of Boca Raton*, 118 S. Ct. 2275, 2292-93 (1998) (discussing the apparent authority basis for employer liability and the affirmative defense available to employers if no tangible employment action is taken).

Thus, evidence of the defendant's conduct which the plaintiff was unaware of at the time is not *a priori* irrelevant to a hostile work environment claim. Nonetheless, we find the district court's failure to consider the potential relevance of such evidence in this case to be harmless error. None of the information the district court excluded would have saved Ms. Miller's claims from summary judgment. As we discussed above, the court properly determined that Ms. Miller failed to sufficiently demonstrate harassment severe or pervasive enough to

constitute a hostile work environment. The only evidence Ms. Miller could have used to make this showing was conduct she was aware of during her employment. *See Hirase-Doi*, 61 F.3d at 782. Information about Mr. Corbridge's conduct outside Ms. Miller's work environment and conduct she was unaware of at the time would not have created a genuine fact issue regarding the severity and pervasiveness of the alleged harassment. [12] The same is true for her *quid pro quo* claim. The district court granted summary judgment on that claim because Ms. Miller failed to identify a tangible job benefit. None of the excluded information pertains to Ms. Miller's employment or the specific job benefits she allegedly lost. Thus, we cannot say that the district court's ruling, even if erroneous, affected the substantial rights of the parties or precluded a fair trial. As such, we find no abuse of discretion warranting reversal. *See Frontier Refin.*, 136 F.3d at 705 (concluding that an erroneous discovery ruling requires reversal only if it affected the substantial rights of the parties); *Gaines v. Ski Apache*, 8 F.3d 726, 730 (10th Cir 1993) ("The trial court has broad discretion regarding its control of

---

[12] We recognize that Ms. Miller could have used that evidence to prove Mr. Corbridge's discriminatory intent. However, proof of motive or lack thereof was not a key issue in the district court's decision. Moreover, evidence of motive would not change the ultimate outcome in this case because, even if we assume that all of the conduct Ms. Miller witnessed was in fact motivated by discriminatory intent, we are still unable to conclude that a rational jury could find that conduct sufficiently severe or pervasive. *Cf. Penry*, 155 F.3d at 1263 (concluding plaintiff's evidence, including both gender-motivated conduct and conduct that merely had gender-related implications, was insufficient to defeat summary judgment of her hostile work environment claim).

discovery, and we will find that discretion to have been abused only when a denial of discovery precludes a fair trial." (Internal quotation marks and citation omitted.); *Miller v. United States*, 710 F.2d 656, 666 (10th Cir.) (concluding trial court made no prejudicial error in limiting discovery where there were no facts plaintiffs could have developed to avoid dismissal of their claim), *cert. denied*, 464 U.S. 939 (1983).

For the same reason, we affirm the district court's ruling regarding the ombudsman privilege. It is clear that neither Colorado law nor federal law, including the decisions of this circuit, recognize an ombudsman privilege. Other federal courts have gone both ways on the issue. *Compare Carman v. McDonnell Douglas Corp.,* 114 F.3d 790, 793-94 (8th Cir. 1997) (concluding complaints registered with a corporate ombudsman office were not privileged) *with Shabazz v. Scurr*, 662 F. Supp. 90, 92 (S.D. Iowa 1987) (concluding communications received by prison ombudsman were privileged). We find it unnecessary to address the issue here because the district court's ruling does not affect the substantial rights of the parties. The information precluded under the privilege concerns other employees' work experiences and other employee's complaints of discriminatory conduct. It does not relate to the work environment Ms. Miller experienced nor the tangible job benefits she lost and, therefore, could not have

saved her Title VII or § 1983 claims from summary judgment.

Accordingly, we **AFFIRM** the district court's discovery rulings and order granting summary judgment in favor of the University and Mr. Corbridge.

**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge